UNITED STATES of America, Appellee,

v.

Ronald BROWN, Defendant-Appellant.

No. 1282, Docket 85–1050.

United States Court of Appeals,
Second Circuit.

Argued June 11, 1985.

Decided Nov. 4, 1985.

---

Martin R. Stolar, New York City (Stolar Alterman Wagner & Boop, P.C., New York City, of counsel), for defendant-appellant.

Stuart Abrams, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., Michael Kellogg, Warren Eggleston, Asst. U.S. Attys., New York City, of counsel), for appellee.

Before FRIENDLY, OAKES and WINTER, Circuit Judges.

FRIENDLY, Circuit Judge:

This is another case, *see United States v. Peterson*, 768 F.2d 64 (2 Cir.1985), where the federal narcotics laws have been in-

voked with respect to the New York City Police Department's Operation Pressure Point in Harlem. Here, as in *Peterson,* Officer William Grimball, acting under cover as an addict, procured a "joint" of heroin, and a backup team promptly pounced on those thought to have been involved in the sale.

The indictment, in the District Court for the Southern District of New York, contained two counts. Count One charged appellant Ronald Brown and a codefendant, Gregory Valentine, with conspiring to distribute and to possess with intent to distribute heroin in violation of 21 U.S.C. § 846. Count Two charged them with distribution of heroin in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2. After a three day trial, the jury convicted Brown on Count One but was unable to reach a verdict on Count Two.[1] After denying, in a written opinion, motions under F.R.Crim.P. 29 and 33 for entry of judgment of acquittal or a new trial, the judge suspended imposition of sentence on Count One and placed Brown on three years' probation. Count Two was dismissed with the Government's consent. This appeal followed.

Officer Grimball was the Government's principal witness. He testified that early in the evening of October 9, 1984, he approached Gregory Valentine on the corner of 115th Street and Eighth Avenue and asked him for a joint of "D".[2] Valentine asked Grimball whom he knew around the street. Grimball asked if Valentine knew Scott. He did not. Brown "came up" and Valentine said, "He wants a joint, but I don't know him." Brown looked at Grimball and said, "He looks okay to me." Valentine then said, "Okay. But I am going to leave it somewhere and you [meaning Officer Grimball] can pick it up." Brown interjected, "You don't have to do that. Just go and get it for him. He looks all right to me." After looking again at Grimball,

Brown said, "He looks all right to me" and "I will wait right here."

Valentine then said, "Okay. Come on with me around to the hotel." Grimball followed him to 300 West 116th Street, where Valentine instructed him, "Sit on the black car and give me a few minutes to go up and get it." Valentine requested and received $40, which had been prerecorded, and then said, "You are going to take care of me for doing this for you, throw some dollars my way?," to which Grimball responded, "Yeah."

Valentine then entered the hotel and shortly returned. The two went back to 115th Street and Eighth Avenue, where Valentine placed a cigarette box on the hood of a blue car. Grimball picked up the cigarette box and found a glassine envelope containing white powder, stipulated to be heroin. Grimball placed $5 of prerecorded buy money in the cigarette box, which he replaced on the hood. Valentine picked up the box and removed the $5. Grimball returned to his car and made a radio transmission to the backup field team that "the buy had went down" and informed them of the locations of the persons involved. Brown and Valentine were arrested. Valentine was found to possess two glassine envelopes of heroin and the $5 of prerecorded money. Brown was in possession of $31 of his own money; no drugs or contraband were found on him. The $40 of marked buy money was not recovered, and no arrests were made at the hotel.

The Government sought to qualify Officer Grimball as an expert on the bases that he had made over 30 street buys of small quantities of cocaine in Harlem, had received two 8½ hour seminars at the Organized Crime Control Bureau "in respect to street value of drugs, safety, integrity," had once been assigned to the Manhattan North Narcotics Division where he had informal seminars with undercover detectives experienced in making street buys in the Harlem target area, and had partici-

---

1. Valentine was a fugitive at the time of trial.

2. The officer explained that a "joint" is a street term for a Harlem quarter, or $40 worth of heroin, and that "D" is a street term for heroin.

pated in "ghost operations," where he as undercover would be placed "on the set" and would observe an experienced undercover detective in an actual buy operation. The judge having ruled him to be qualified as an expert, he testified that the typical drug buy in the Harlem area involved two to five people. As a result of frequent police sweeps, Harlem drug dealers were becoming so cautious that they employed

> people who act as steerers and the steerer's responsibility is basically to determine whether or not you are actually an addict or a user of heroin and they are also used to screen you to see if there is any possibility of you being a cop looking for a bulge or some indication that would give them that you are not actually an addict. And a lot of the responsibility relies [sic] on them to determine whether or not the drug buy is going to go down or not.

Officer Grimball was then allowed, over a general objection, to testify that based on his experience as an undercover agent he would describe the role that Ronald Brown played in the transaction as that of a steerer. When asked why, he testified, again over a general objection, "Because I believe that if it wasn't for his approval, the buy would not have gone down."

### Objections to the Admissibility of Officer Grimball's Expert Testimony

■ We deal first with appellant's contention that all the testimony given by Grimball as an expert should have been excluded because Grimball was unqualified. In reviewing the district court's decision to treat Grimball as an expert, we note that "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *see also Fernandez v. Chios Ship-*

*ping Co.*, 542 F.2d 145, 153 (2 Cir.1976). The decision that Grimball possessed sufficient knowledge and experience was by no means manifestly erroneous. F.R.E. 702, entitled Testimony by Experts, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The words "qualified as an expert by knowledge, skill, experience, training, or education" must be read in light of the liberalizing purpose of the Rule, embodied in its introductory clause which has been called "the central concern of Article VII," *see* 3 Weinstein's Evidence ¶ 702[01], at 702–7 (1982), and is further evidenced by F.R.E. 704(a).[3] While Grimball was scarcely a Chief Superintendent Maigret, he knew a good deal more about street narcotics deals in Harlem than did the jurors, who would consequently be "assisted" by his description of the terms and practices generally used in such sales. For that reason we cannot characterize as "manifestly erroneous" the judge's conclusion that testimony from Grimball that street drug sales in Harlem generally involved the use of a steerer, at least after the inauguration of Operation Pressure Point, would "assist the trier of the fact to understand the evidence or to determine a fact in issue." *See* Ladd, *Expert Testimony*, 5 Vand.L. Rev. 414, 418 (1952), *quoted in* F.R.E. 702 Advisory Committee Note.

■ The admission of Grimball's opinion testimony that Brown was fulfilling the role of a steerer raises a closer question. We recognize that Rule 704(a), quoted in note 3 *supra*, abolished the antiquated rule, more frequently honored in the breach than the observance, excluding expert testimony "because it embraces an ultimate issue to be decided by the trier of

---

**3.** This provides:

> Except as provided in subdivision (b), testimony in the form of an opinion or inference

otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

fact." [4] However, there is something rather offensive in allowing an investigating officer to testify not simply that a certain pattern of conduct is often found in narcotics cases, leaving it for the jury to determine whether the defendant's conduct fits the pattern, but also that such conduct fitted that pattern, at least when other inferences [5] could have been drawn not unreasonably although perhaps not as reasonably as that to which the expert testified. Grimball's testimony casting Brown in the role of a steerer comes close to, although it is not within, F.R.E. 704(b), which provides:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Even though the testimony is not barred by F.R.E. 704(b), district judges should heed the Advisory Committee's Note to Rule 704:

> The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against

the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day.

We would thus agree with Judge Newman's precautionary observations about the admission of such testimony in *United States v. Young*, 745 F.2d 733, 765–66 (2 Cir.1984) (Newman, J., concurring), *cert. denied,* —— U.S. ——, 105 S.Ct. 1842, 85 L.Ed. 2d 142 (1985), which we quote in the margin,[6] and commend this for consideration by district judges.

However, in *United States v. Carson*, 702 F.2d 351, 369 (2 Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983), this court refused to reverse because of the admission of testimony of investigating officers, in that case with an aggregate of 20 years' experience, that the ambiguous, furtive conduct they had seen undertaken by the defendant was in fact the sale of narcotics. This was true also in *United States v. Young, supra,* 745 F.2d at 744, 752–53, 760, where a police detective was permitted, after testifying about certain events that he had observed, to testify further "as an expert 'that it was a narcotics transaction that took place.'" While *United States v. Sette*, 334 F.2d 267, 269 (2 Cir.1964), decided before adoption of the Federal Rules of Evidence, reversed a conviction based primarily on the opinion testimony of investigating officers that the defendant had committed the offense, the

---

**4.** The rule had been followed even by the Supreme Court. *See, e.g., United States v. Spaulding*, 293 U.S. 498, 506, 55 S.Ct. 273, 276, 79 L.Ed. 617 (1935).

**5.** *E.g.*, that Brown was a friend and not a business partner of Valentine; that Brown was interested in buying drugs for his own use or for sale and was thus eager to get Grimball's transaction out of the way; that Brown simply wanted Valentine to take care of his business with Grimball so that Brown and Valentine could get away; or that Valentine was doubling in the roles of steerer and procurer for a seller in the hotel so there was no need for having Brown act as a steerer.

**6.** Even if admissible under Rule 702, opinion testimony is still subject to exclusion under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice."

Whatever slight probative value arises from a narcotics expert's personal opinion that an observed transaction involved a sale of drugs must be carefully weighed against the distinct risk of prejudice. The "aura of special reliability and trustworthiness" surrounding expert testimony, which ought to caution its use, *United States v. Fosher*, 590 F.2d 381, 383 (1st Cir.1979); *United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir.1973), especially when offered by the prosecution in criminal cases, *United States v. Green*, 548 F.2d 1261, 1268 (6th Cir.1977), poses a special risk in a case of this sort. That risk arises because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial. The risk is increased when the opinion is given by "the very officers who were in charge of the investigation," *United States v. Sette*, [334 F.2d 267, 269 (2 Cir.1964)].

court did not state that such evidence was inadmissible, but rather that it could not be used to establish a prima facie case against a defendant where the rest of the government's evidence was insufficient. Because, as we discuss below, there was insufficient evidence here to support Brown's conviction even without Grimball's expert opinion testimony, *Sette* is inapposite. *See infra* note 9. We must therefore reject the claim of error in admitting Officer Grimball's testimony that Brown was a steerer.[7]

### Sufficiency of the Evidence

In considering the sufficiency of the evidence, we begin with some preliminary observations. One is that, in testing sufficiency, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). The Court also approved, 443 U.S. at 318 n. 11, 99 S.Ct. at 2788 n. 11, our formulation in *United States v. Taylor*, 464 F.2d 240, 243 (2 Cir.1972), which included the language, borrowed from Judge Prettyman's opinion in *Curley v. United States*, 160 F.2d 229, 232–33 (D.C.Cir.), *cert. denied*, 331 U.S. 837, 67 S.Ct. 1512, 91 L.Ed. 1850 (1947), that if reasonable jurors must necessarily have a reasonable doubt as to guilt, the judge must direct a verdict of acquittal. We repeat these familiar quotations because the beyond a reasonable doubt element tends to become blurred by the Government's standard reliance on lan-

guage in *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942) ("The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it."). Still *Jackson*'s emphasis on "*any*," while surely not going so far as to excise "rational," must be taken as an admonition to appellate judges not to reverse convictions because they would not have found the elements of the crime to have been proved beyond a reasonable doubt when other rational beings might do so.

■ The second observation is that since the jury convicted on the conspiracy count alone, the evidence must permit a reasonable juror to be convinced beyond a reasonable doubt not simply that Brown had aided and abetted the drug sale but that he had agreed to do so. *United States v. Borelli*, 336 F.2d 376, 384 (2 Cir.1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). On the other hand, the jury's failure to agree on the aiding and abetting charge does not operate against the Government; even an acquittal on that count would not have done so. *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932) (Holmes, J.); *Steckler v. United States*, 7 F.2d 59, 60 (2 Cir.1925) (L. Hand, J.); *United States v. Carbone*, 378 F.2d 420 (2 Cir.), *cert. denied*, 389 U.S. 914, 88 S.Ct. 242, 19 L.Ed.2d 262 (1967).[8]

■ A review of the evidence against Brown convinces us that it was sufficient, even without Grimball's characterization of Brown as a steerer, although barely so.[9]

---

**7.** While we have reached this conclusion on the merits, we think it highly doubtful that Brown's general objection to Officer Grimball's expert testimony was sufficient to preserve for appeal the particularized objection to this portion of Grimball's testimony. *See* F.R.E. 103(a)(1).

**8.** This scarcely seems to be the case for reconsidering these and many other holdings to the same effect, as the dissent appears to propose in note 2, even if we had the power to do so. Here the jury did not acquit on the substantive count but simply disagreed. Even the dissent in *Dunn* did not assert that this kind of inconsistency would impair a verdict. Moreover, there was

no true inconsistency here. The line between conspiring and aiding and abetting is thin, *see* note 10 *infra;* this jury could rationally be satisfied of the former although, particularly in view of the lack of evidence directly linking Brown with the narcotics, it could not reach a verdict as to the latter.

**9.** Because we conclude that there was sufficient evidence to convict Brown without Officer Grimball's opinion testimony that Brown was a steerer in the transaction, we need not address the proposal in Judge Newman's concurring opinion in *Young, supra*, 745 F.2d at 766, adopted in *United States v. Jones*, 605 F.Supp.

Although Brown's mere presence at the scene of the crime and his knowledge that a crime was being committed would not have been sufficient to establish Brown's knowing participation in the conspiracy, *United States v. Soto,* 716 F.2d 989, 991 (2 Cir.1983); *United States v. Gaviria,* 740 F.2d 174, 184 (2 Cir.1984), the proof went considerably beyond that. Brown was not simply standing around while the exchanges between Officer Grimball and Valentine occurred. He came on the scene shortly after these began and Valentine immediately explained the situation to him. Brown then conferred his seal of approval on Grimball, a most unlikely event unless there was an established relationship between Brown and Valentine. Finally, Brown took upon himself the serious responsibility of telling Valentine to desist from his plan to reduce the risks by not handing the heroin directly to Grimball. A rational mind could take this as bespeaking the existence of an agreement whereby Brown was to have the authority to command, or at least to persuade. Brown's remark, "Just go and get it for him," permits inferences that Brown knew where the heroin was to be gotten, that he knew that Valentine knew this, and that Brown and Valentine had engaged in such a transaction before.

The mere fact that these inferences were not ineluctable does not mean that they were insufficient to convince a reasonable juror beyond a reasonable doubt. Moreover, as we said in *United States v. Geaney,* 417 F.2d 1116, 1121 (2 Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), "pieces of evidence must be viewed not in isolation but in conjunction." *See also United States v. Monica,* 295 F.2d 400, 401–02 (2 Cir.1961), *cert. denied,* 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962); *United States v. Stanchich,* 550 F.2d 1294, 1300 (2 Cir.1977). When we add to the inferences that can be reasonably drawn from the facts to which Grimball testified the portion of his expert testimony about the use of steerers in street sales of narcotics, which was clearly unobjectionable once Grimball's qualifications were established, we conclude that the Government offered sufficient evidence, apart from Grimball's opinion that Brown was a steerer, for a reasonable juror to be satisfied beyond a reasonable doubt not only that Brown had acted as a steerer but that he had agreed to do so.[10]

Affirmed.

---

513, 515–16 (S.D.N.Y.1984), that such testimony should not be countable in assessing the sufficiency of the evidence, although we confess some difficulty with the proposition that properly admitted evidence should be totally excluded from the scale and do not consider that *United States v. Sette, supra,* 334 F.2d 267, now calls for that conclusion. The issue may be largely semantic since the judge can give little weight to testimony such as that here in question.

**10.** We do not read *United States v. Tyler,* 758 F.2d 66 (2 Cir.1985), as being to the contrary. The court read the evidence as showing "no more than that Tyler helped a willing buyer find a willing seller." *Id.* at 70. Since there was no basis for inferring a prior contact between Tyler, the introducer, and Bennett, the seller, Tyler could properly be convicted only as an aider or abettor, not as a conspirator. Here a jury could reasonably infer prior arrangements or an established working relationship between Brown and Valentine. Chief Judge Motley's opinion in *United States v. Jones, supra,* 605 F.Supp. 513, also relied upon by Brown, is readily distinguishable. There was insufficient evidence for a jury to conclude beyond a reasonable doubt that Jones, the counterpart of Brown in that case, even knew that a narcotics transaction was going on. By contrast, Brown's conversation with Valentine in the presence of Grimball establishes that he knew precisely what the transaction was. Finally, the facts in *United States v. Cepeda,* 768 F.2d 1515 (2 Cir.1985) (Oakes, J.), relied upon by the dissent, are not analogous to the situation here. In *Cepeda,* there was no evidence that there had been a sale, or that anyone other than the defendant was involved in the transaction. Thus, two elements of the charged conspiracy were called into question—the agreement with other persons and the intent to distribute. Here, there is no question that a sale occurred, and it is clear that Brown and at least one other person, Valentine, participated in the transaction. Thus, the only further inference required for a conviction—that Brown's participation was pursuant to an agreement with Valentine, with someone else, or with both—is much stronger. *United States v. Ford,* 771 F.2d 60 (2 Cir.1985), affirming a conviction both on conspiracy and substantive counts, from which Judge Oakes dissented, is closer to Brown's case.

OAKES, Circuit Judge (dissenting):

While it is true that this is another $40 narcotics case, see, e.g., *United States v. Peterson*, 768 F.2d 64 (2d Cir.1985), it is also a conspiracy case, and by the majority's own admission one resting on "barely" sufficient evidence. But evidence of what? An agreement—a "continuous and conscious union of wills upon a common undertaking," in the words of Note, *Developments in the Law—Criminal Conspiracy*, 72 Harv.L.Rev. 920, 926 (1959)? Not unless an inference that Brown agreed to act as a "steerer" may be drawn from the fact that he said to Valentine (three times) that Grimball "looks okay [all right] to me," as well as "[j]ust go and get it for him." And the only way that inference may be drawn so as to prove guilt beyond a reasonable doubt is, in my view, with assistance from the "expert" testimony of the ubiquitous Officer Grimball, *see United States v. Peterson, supra*. It could not be drawn from Brown's possession, constructive or otherwise, of narcotics or narcotics paraphernalia, his sharing in the proceeds of the street sale, his conversations with others, or even some hearsay evidence as to his "prior arrangements" with Valentine or "an established working relationship between Brown and Valentine," which are inferences that the majority, Majority Opinion at note 10, believes may reasonably be drawn and which it draws so as to distinguish *United States v. Tyler*, 758 F.2d 66 (2d Cir.1985). There is not a shred of evidence of Brown's "stake in the outcome," *United States v. Falcone*, 109 F.2d 579, 580 (2d Cir.), *aff'd*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); indeed, Brown was apprehended after leaving the area of the crime with only thirty-one of his own dollars in his pocket, and no drugs or other contraband. He did not even stay around for another Valentine sale, though the majority infers, speculatively, that Brown and Valentine had engaged in "such a transaction before."

When, as the majority concedes, Majority Opinion at note 5, numerous other inferences could be drawn from the few words of conversation in which Brown is said to have engaged, I cannot believe that there is proof of *conspiracy*, or Brown's membership in it, beyond a reasonable doubt, within the meaning of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), unless one gives the Court's emphasis on the word "any"—"*any* rational trier of fact," *id.* at 319, 99 S.Ct. at 2789—such weight that the word "rational" receives little or no significance at all. Until now, as we said in *United States v. Cepeda*, 768 F.2d 1515 (2d Cir.1985), "the court has insisted on proof, whether or not by circumstantial evidence, ... of a specific agreement to deal." [1]

This case may be unique. It, like *Cepeda*, supports Justice Jackson's reference to the history of the law of conspiracy as exemplifying, in Cardozo's phrase, the " 'tendency of a principle to expand itself to the limits of its logic.' " *Krulewitch v. United States*, 336 U.S. 440, 445, 69 S.Ct. 716, 719, 93 L.Ed. 790 (1949) (Jackson, J., concurring) (footnote omitted). But it also illustrates Cardozo's phrase at work in two other respects—the use of "expert" testimony to prove guilt and the proposition that inconsistent verdicts on different counts are immaterial. Both are carried here to their logical extremes. And the convergence of these three threads in the case of the street sale to Officer Grimball

---

**1.** The majority clearly states there is sufficient evidence without Officer Grimball's expert testimony to support the conspiracy charge. But the inferences it draws seem based in part on that testimony. I agree with Judge Newman that an expert's opinion that a defendant's conduct is criminal may not "carry the prosecution's proof above the requisite line." *United States v. Young*, 745 F.2d 733, 766 (2d Cir.1984) (Newman, J., concurring). This circuit's law in *United States v. Sette*, 334 F.2d 267, 269 (2d Cir.1964), has not been overruled, except perhaps as a practical consequence of this case, in which an officer involved in the investigation is found, on the basis of a mere four months' undercover experience, to be sufficiently "expert" to permit his testimony concerning the use of steerers in street narcotics sales to supply to the jury (and I believe the majority of this panel) the marginal increment necessary to sustain a conviction.

seems to me, again to borrow a phrase from Justice Jackson's *Krulewitch* concurrence, to "constitute[ ] a serious threat to fairness in our administration of justice." *Id.* at 446, 69 S.Ct. at 720. If today we uphold a conspiracy to sell narcotics on the street, on this kind and amount of evidence, what conspiracies might we approve tomorrow? The majority opinion will come back to haunt us, I fear.

On the use of Officer Grimball's expert testimony, I note the following. A "steerer" is presumably one who leads buyers of narcotics to suppliers. Brown's alleged role, however, was either to instruct Valentine, who received a $5 tip for *his* role as "steerer" to the hotel supplier (although Grimball did testify that suppliers as well as steerers occasionally ask for "tips"), or to serve as an evaluator of a buyer's bona fides. In light of Grimball's limited undercover experience, his broader definition of a "steerer" so as to encompass Brown's role, whatever that role was, lacks the ring of expertise. I point out that Officer Grimball's four months of undercover narcotics experience (during which he made some thirty to fifty street purchases, none involving more than $50), by his own admission, did not give him enough experience (1) to say whether or not before "Operation Pressure Point" only one person was involved in street sales; (2) to testify of his own knowledge that "in some drug transactions ... the dealer will act like he is going somewhere else to retrieve the narcotics when, in fact, he already has the drugs on his person"; or (3) ever to have participated in an operation (A) using a Nagra or other small tape recorder on an officer's body or (B) where photographs of the individuals or sale were taken. At the very least, he should not have been permitted to testify that Brown was a "steerer." *See* Majority Opinion note 6 and accompanying text. Not only was Grimball no Maigret, he was neither a Johnson nor a West, *see United States v. Carson*, 702 F.2d 351, 369 & n. 24 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983) (two agents who together had twenty years' experience as officers of narcotics branch of District of Columbia police department), nor a Hight, as in *United States v. Young*, 745 F.2d 733, 760 (2d Cir.1984) ("unquestionably qualified as an expert"). These cases are weak reeds indeed for admission of Grimball's expert testimony. And without his "expert" testimony as to Brown's role, I do not believe that the evidence was sufficient to sustain a conviction, and therefore its admission was not harmless error.

As for the rule that "[e]ach count in an indictment is regarded as if it was a separate indictment," *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932) (citations omitted),[2] so that acquittal on a substantive count is not fatal to a conviction for conspiracy, *see United States v. Powell*, ── U.S. ──, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), the verdicts in this case carry the rule to the ultimate extreme. Here the only overt act attributed in the indictment to Brown was the same conversation with Valentine that grounded the substantive charge of aiding and abetting, a charge on which Brown

**2.** Judge Friendly's opinion in *United States v. Carbone*, 378 F.2d 420, 422 (2d Cir.1967), carefully pointed out that this proposition in *Dunn* is erroneous insofar as it rests on Justice Holmes's statement immediately following it to the effect that an acquittal on one indictment could *not* be pleaded res judicata of a separate indictment resting on the same evidence. The strongest support for the proposition that consistency in a verdict is unnecessary, Judge Friendly's *Carbone* opinion explained, is that the jury must be left free to exercise its historic power of lenity. At the same time, as any prosecutor (or defense attorney) is well aware, a two-count indictment gives a jury in a close case

an opportunity to compromise by acquitting on one count while convicting on the other. And I am not at all as sure as Judge Friendly was in *Carbone* of the proposition that "if the rule [that inconsistent verdicts may stand] were otherwise, the Government would be entitled to have the jury warned that an acquittal on some counts might undermine a guilty verdict on others." *Id.* at 422. Why? On what authority? If the Government chooses to bring an indictment on alternative theories—that the defendant is a coperpetrator *and* an accessory—why should it not be bound to take its chances on the consistency of the verdict?

was acquitted. The case appears to me to be the very kind of compromise verdict foreseen by Judge Learned Hand in *Steckler v. United States*, 7 F.2d 59, 60 (2d Cir.1925), and by Justice Holmes in *Dunn*, 284 U.S. at 394, 52 S.Ct. at 191. It may be that, in a given case, *see, e.g., Tyler*, 758 F.2d at 71–72, evidence may support a conviction on an aiding and abetting count without supporting a conviction on a conspiracy count. But it is hard to see how, in the case of a completed sale, there can be a conviction of conspiracy but not of aiding and abetting, especially when there is no evidence of a "stake in the outcome."

Although, according to the majority, the admission of "expert" testimony is "rather offensive," the evidence was "sufficient ... although barely so," and the verdict is both inconsistent and very probably a compromise, the court permits this conspiracy conviction to stand. I fear that it thereby promotes the crime of conspiracy—"that darling of the modern prosecutor's nursery," *Harrison v. United States*, 7 F.2d 259, 263 (2d Cir.1925) (L. Hand, J.)—to a role beyond that contemplated even by Sgt. Hawkins of *Pleas of the Crown* fame. *See* Note, *Developments in the Law—Criminal Conspiracy, supra*, at 923 & n. 14; P. Winfield, *The Chief Sources of English Legal History* 325–26 (1925). Precisely because this is another $40 narcotics case, I would draw the line. This case effectively permits prosecution of everyone connected with a street sale of narcotics to be prosecuted on two counts—a conspiracy as well as a substantive charge. And evidence showing no more than that a defendant was probably aware that a narcotics deal was about to occur will support a conspiracy conviction, our previous cases to the contrary notwithstanding.

Accordingly, I dissent.